IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VONZELL WHITE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 11-cv-7802 |
| v. ) | |
| ) | Hon. John Z. Lee |
| CITY OF CHICAGO and CHICAGO POLICE, ) | |
| OFFICER JOHN O'DONNELL ) | |
| STAR #4425 ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Chicago Police Officer John O'Donnell ("Officer O'Donnell") and the City of Chicago move for summary judgment on Plaintiff Vonzell White's claims for unlawful arrest in violation of the Fourth and Fourteenth Amendments and malicious prosecution in violation of Illinois law. This case involves allegations of civil rights violations stemming from an undercover operation leading to Plaintiff's arrest for the sale of heroin. Defendants argue that Officer O'Donnell had probable cause for seeking an arrest warrant and further argue that there is no genuine evidentiary dispute as to three material elements needed for Plaintiff to succeed at trial against the City of Chicago on the malicious prosecution claim: probable cause, malice, and "favorable termination."

Plaintiff opposes summary judgment and argues primarily that portions of his deposition testimony disputing the events recounted in the undercover report create genuine issues of material fact with respect to both of his claims. Plaintiff also argues the report is deficient because it does not offer information on the confidential informant's reliability. For the reasons provided herein, the Court grants Defendants' motion.

1

# I. Factual Background

## A. The Undercover Operation

The following facts are undisputed, except where otherwise noted. "Blue Knight," a joint operation of the FBI and the Chicago Police Department begun in 2008, aimed to target certain high narcotics areas in the West Side of Chicago. Defs.' LR 56.1(a)(3) Stmt. ¶ 6. Operation Blue Knight employed confidential informants who cooperated with law enforcement by supplying information, wearing video and audio recording equipment, and engaging in covert transactions with narcotics sellers. *Id.* ¶ 7. Many of the sellers targeted by Operation Blue Knight were members of the Traveling Vice Lords street gang. *Id.*

On July 31, 2010, FBI agents and Chicago police officers conducted a covert narcotics purchase involving a Confidential Informant ("C/I") nicknamed "Kangol." *Id.* ¶ 8. Officer O'Donnell was not involved in this July 31, 2010, narcotics purchase. *Id.* ¶ 9. Plaintiff and Vernon Chapman were involved in the sale, though Plaintiff disputes the extent of his role. Defendants argue that both Plaintiff and Chapman arrived at a bus shelter on Sacramento Boulevard and sold heroin to the C/I. *Id.* ¶ 10. Plaintiff remembers standing thirty feet away while the heroin sale was conducted; only Chapman had a conversation with the C/I. Pl.'s LR 56.1(b)(3) Stmt. ¶ 10. In either case, the C/I made the heroin purchase with pre-marked bills. Defs.' LR 56.1(a)(3) Stmt. ¶ 10. Officer Lipsey, a surveillance officer for the covert narcotics purchase, prepared a Narcotics and Gang Investigation Supplementary Report ("NAGIS Report"), detailing the July 31, 2010, operation. *Id.* ¶¶ 11–12; *see generally id.* Ex. G (NAGIS Report).

The July 31, 2010, NAGIS Report identifies Plaintiff and Chapman as members of the Traveling Vice Lords street gang. Defs.' LR 56.1(a)(3) Stmt. ¶ 13. Both Plaintiff and Chapman

are listed as offenders who delivered the heroin to the C/I on July 31, 2010. *Id.* More specifically, the July 31, 2010, NAGIS Report details that the C/I, using an audio and video recording device, and armed with $300.00 in pre-marked bills, observed Plaintiff and Chapman approaching together in a van and, after exiting the van, walking southbound on Sacramento Boulevard approaching Chicago Avenue. *Id.* ¶ 14. Plaintiff and Chapman approached the C/I. *Id.* The three engaged in conversation behind the bus shelter, and then walked together to the C/I's vehicle. *Id.* Plaintiff and Chapman then turned back and began walking northbound on Sacramento Boulevard. *Id.* And the C/I entered his vehicle. *Id.*

After this, the C/I exited his vehicle and contacted Agent Cyprian to confirm a positive purchase of heroin. *Id.* Plaintiff and Chapman left the scene and drove away in their van. *Id.* Officers recovered the heroin from the C/I and inventoried it. *Id.* The C/I then positively identified both Plaintiff and Chapman from a photo array. *Id.* The NAGIS Report further details that the drugs bought by the C/I field tested positive for heroin. *Id.* Ex. G., pg. 3.

### B. Judge Ford Issues an Arrest Warrant

After documenting criminal activity from Fall 2008 to Summer 2010, Operation Blue Knight moved into an arrest and prosecution phase during which certain targets were to be prosecuted in state court in Cook County and other targets were to be prosecuted in federal court. Defs.' LR 56.1(a)(3) Stmt. ¶¶ 16–17. Defendant Officer O'Donnell acted as the Operation Blue Knight case officer and sought to secure warrants for several targets, including Plaintiff. *Id.* ¶ 18. On November 10, 2010, Officer O'Donnell signed a criminal complaint against Plaintiff for delivery of a controlled substance based on the July 31, 2010, NAGIS Report. *Id.* ¶ 20.

On November 16, 2010, Officer O'Donnell and the Assistant States Attorney ("ASA") assigned to the case, Dan Fahlgren, appeared before Illinois Circuit Judge Nicholas Ford to

3

secure arrest warrants for targets of Operation Blue Knight. *Id.* ¶ 21. Judge Ford placed Officer O'Donnell under oath. *Id.* ¶ 22. Officer O'Donnell then presented the criminal complaints to Judge Ford; as to Plaintiff, Officer O'Donnell gave a statement based on the contents of NAGIS Report. *Id.* ¶¶ 22–23. Fahlgren, though present, does not recall what in particular Officer O'Donnell communicated to Judge Ford. *Id.* ¶ 24. But Falhgren avers that the police reports would have constituted the information presented to Judge Ford. *Id.*

Fahlgren agrees that the July 31, 2010, NAGIS Report characterizes Plaintiff and Chapman as having committed the crime of delivery of a controlled substance. *Id.* ¶ 25. Fahlgren also avers that Officer O'Donnell did not need to prepare a sworn affidavit to secure an arrest warrant for Plaintiff,[1] and that at the time he and Officer O'Donnell sought the arrest warrant, they believed they had probable cause. *Id.* ¶¶ 26–27. Judge Ford signed the criminal complaint and issued the warrant for Plaintiff's arrest on November 16, 2010. *Id.* ¶ 29.

### C. Plaintiff's Criminal Case and Its Dismissal

Plaintiff was arrested on November 17, 2010, inside an apartment at the 1100 block of North Harding Avenue. *Id.* ¶ 37; *see also* Pl.'s LR 56.1(b)(3)(c) Stmt. ¶ 2. Plaintiff was an overnight guest of the owner of the apartment at the 1100 block of North Harding Avenue. Pl.'s Pl.'s LR 56.1(b)(3)(c) Stmt. ¶ 3. On December 15, 2010, after Plaintiff's arrest, a grand jury indicted him with one count of delivery of a controlled substance under 720 Ill. Comp. Stat. Ann. 570/401(c)(1). Defs.' LR 56.1(a)(3) Stmt. ¶ 38. Plaintiff's criminal trial was set for July 21, 2011. *Id.* ¶ 39.

ASA Theresa Smith-Conyers was assigned to prosecute Plaintiff. *Id.* ¶ 40. Smith-Conyers intended for the C/I to testify at trial, but because the C/I was a confidential source

---

[1] Notwithstanding Plaintiff's contention that the legal opinions of Fahlgren are irrelevant, this is a correct statement of Illinois law. *See* 725 Ill. Comp. Stat. Ann. § 5/107-9.

4

working for the FBI, Smith-Conyers needed to arrange for the C/I's availability with the FBI or an Assistant United States Attorney ("AUSA") in the United States Attorney's Office. *Id.* ¶ 41. Subsequently, Smith-Conyers spoke to Agent Cyprian, the C/I contact liaison, to arrange for the C/I's participation. *Id.* Agent Cyprian informed Smith-Conyers that he would check with the AUSAs in charge of criminal matters in federal court, in particular, those in charge of the federal case against Chapman. *Id.* ¶ 43. Agent Cyprian then informed Smith-Conyers that the C/I no longer resided in Illinois but that he would make the C/I available for trial. *Id.* ¶ 44. Smith-Conyers subsequently subpoenaed the C/I on June 24, 2011. *Id.* ¶ 45.

In addition to securing the C/I's participation as a witness at trial, Smith-Conyers reviewed the video and audio recordings that the C/I made during the July 31, 2010, purchase. *Id.* ¶ 46. Around July 14, 2011, Agent Cyprian provided Smith-Conyers with the name and date of birth of the C/I, and Smith disclosed this information to Plaintiff's criminal defense attorney. *Id.* ¶ 48. At this same time, however, Agent Cyprian informed Smith-Conyers that he would not produce the C/I for trial, the C/I would not be available for trial, and the C/I had yet to testify in Chapman's federal case. *Id.* ¶ 49.

Thereafter, on July 21, 2011, Smith-Conyers made an oral *nolle prosequi* motion during Plaintiff's criminal bench trial. *Id.* ¶ 50. Smith-Conyers made the *nolle prosequi* motion because the C/I was unavailable to testify. *Id.* ¶¶ 52–53. Subsequent to the dismissal of Plaintiff's case, Chapman was convicted on all counts of the federal indictment brought against him, including distribution of a controlled substance for the July 31, 2010, incident. *Id.* ¶¶ 54–55.

## III. Legal Standards

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP,* 719 F.3d 785, 794 (7th Cir. 2013). In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and instead "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.,* 674 F.3d 769, 772–73 (7th Cir.2012). The Court will, however, "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 529 (7th Cir. 2000).

### B. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013). "This involves two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011). "Courts may exercise discretion in deciding which question to address first." *Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir.

2013). "The plaintiff carries the burden of defeating the qualified immunity defense." *Rabin*, 725 F.3d at 632.

## IV. Analysis

### A. Officer O'Donnell Should Be Afforded Qualified Immunity

Qualified immunity shields Officer O'Donnell from liability for claims of unlawful arrest in violation of the Fourth and Fourteenth Amendments. Officer O'Donnell does not argue that the law governing unlawful arrest under the Fourth Amendment was not clearly established. Instead, he argues that, even when taking the facts in the light most favorable to Plaintiff, there was no constitutional violation. "A police officer has probable cause to arrest when, at the moment the decision is made, the facts and circumstances within her knowledge and of which she has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999) (citations omitted). In the context of arrests for which probable cause is allegedly lacking, "[i]f a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is any reasonable basis to conclude that probable cause existed." *Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998). "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986).

Here, the testimony of fellow officers involved in Operation Blue Knight, and the NAGIS Report itself, provide two independent evidentiary bases by which a reasonable officer could believe probable cause existed to seek the arrest warrant against Plaintiff for selling heroin.

Officer O'Donnell's reasonable reliance on both bases remains essentially unchallenged by Plaintiff on summary judgment.

It is undisputed that Officer O'Donnell relied on observations made by his fellow officers during Operation Blue Knight. "The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010). "In a civil case for an arrest without probable cause, the collective knowledge doctrine means a defendant is entitled to qualified immunity if he relied in objective good faith on another officer as to the justification for the arrest." *Crawford v. City of Chicago*, No. 12 C 5289, 2014 WL 1661720, at *6 (N.D. Ill. Apr. 25, 2014) (quoting *Graham v. Blair*, Nos. 10–cv–772–JPG–PMF, 10–cv–780–JPG–PMF, 2011 WL 6888528, at *6 (S.D.Ill.Dec. 28, 2011)).

The FBI and the CPD officers who prepared the NAGIS Report worked closely with the C/I and recorded aurally and visually the narcotics sale. It was reasonable for Officer O'Donnell to rely on his fellow officers' representations concerning the details of the undercover narcotics sale, especially as they were captured in the NAGIS Report. Importantly, Plaintiff has presented no evidence challenging this reliance as being either improper or in bad faith. In essence, the only dispute created by the possibility that Plaintiff was standing thirty feet away is whether the observing officers at the narcotics sale had sufficient information for probable cause. But "for purposes of civil liability, the issue is not whether the information actually possessed by the observing officer is sufficient to support probable cause, but whether each individual defendant officer reasonably believed there was probable cause to arrest plaintiff." *Holmes v. City of Chicago*, --- F. Supp. 2d ----, No. 09-CV-2481, 2014 WL 3864570, at *5 (N.D. Ill. Aug. 6, 2014)

More importantly, it is undisputed that Officer O'Donnell gave a sworn statement before Judge Ford based on the contents of the NAGIS Report. *See* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 22–23; Pl.'s LR 56.1(b)(3) Stmt. ¶¶ 22–23. Fahlgren confirmed that Officer O'Donnell relied on the NAGIS Report to establish probable cause. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 24; Pl.'s Resp. Defs.' Stat. Mat. Facts ¶¶ 24. To refute this, Plaintiff offers his own testimony: he remembers standing thirty feet away. Pl.'s LR 56.1(a)(3) Stmt. ¶ 10. While contradictory of facts contained in the NAGIS Report, Plaintiff's testimony does not create a genuine dispute of material fact. "The underlying substantive law governs whether a factual dispute is material: 'irrelevant or unnecessary' factual disputes do not preclude summary judgment." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). And crucially, for unlawful arrest claims, "[t]he existence of probable cause does not depend on the truth of a complaint of wrongdoing." *Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013). The NAGIS Report relied upon by Officer O'Donnell and distilled to Judge Ford may be factually inaccurate, but this, without more, does not create a dispute that is material to a claim of false arrest. For example, Plaintiff could have shown that O'Donnell unreasonably relied on the NAGIS Report because the report itself contains statements that place Plaintiff's presence at Chapman's side during the drug deal in doubt. Or Plaintiff could have shown that Officer O'Donnell had other knowledge creating doubts as to the NAGIS Report's veracity, such as an audio or video recording showing Plaintiff standing thirty feet away. Plaintiff has neither argued these points nor marshalled evidence in support of them.

Plaintiff offers only one argument sounding in unreasonable reliance. Citing *United States v. Glover*, 755 F.3d 811, 815–19 (7th Cir. 2014), Plaintiff contends the NAGIS Report is deficient because it does not contain statements regarding the reliability of the C/I. In essence, Plaintiff relies on *Glover* to argue that Officer O'Donnell "could not reasonably credit" the

NAGIS Report. *Williamson*, 714 F.3d at 441. But *Glover* involved an unknown informant's tip; here, the C/I participated in the narcotics purchase, while wearing audio and visual recording equipment, and closely collaborating with the FBI and CPD. Aside from being factually distinguishable, *Glover* itself notes that the "level of detail," the "extent of firsthand observation," and the "degree of corroboration" may overcome a lack of indicia as to reliability. *Glover*, 755 F.3d at 816. All three appear extensive on the record. "Where information about credibility is not available, other factors such as extensive corroboration may overcome the doubt inherent in relying on an informant without a track record." *Id.* at 818. Here, again, the extent of corroboration was extensive, involving both audio and visual recording and purchase behavior confirmed by various FBI and CPD officers. The failure to insert statements regarding the C/I's reliability into the NAGIS Report does not taint the report as a whole or make Officer O'Donnell's reliance on it unreasonable.

Plaintiff also challenges the validity of the arrest warrant itself based on *Whiteley v. Warden, Wyoming State Penitentiary* and *Byars v. United States*. Both cases are factually distinguishable. Indeed, they serve to reinforce the sufficiency of the information presented in the warrant here. In *Byars v. United States*, the Supreme Court held that a warrant issued only on an affiant's bare belief that the suspect committed a crime, without more, runs afoul of the Fourth Amendment. 273 U.S. 28, 29 (1927). In *Whiteley v. Warden, Wyoming State Penitentiary*, the Supreme Court likewise held that a warrant issued pursuant to nothing more than a sheriff's unadorned statement that the suspects committed the crime, where the sheriff did not even disclose to the magistrate the informant's tip that formed the basis for the statement, also violated the Fourth Amendment. 401 U.S. 560, 564–65 (1971). Officer O'Donnell's warrant application exceeds this. It is undisputed that Officer O'Donnell presented to Judge

Ford more than mere conclusory statements of culpability.[2] Officer O'Donnell presented to Judge Ford a statement based on the NAGIS Report and the facts of Operation Blue Knight. Defs.' LR 56.1(a)(3) ¶ 23. Officer O'Donnell also presented Judge Ford with the criminal complaint against Plaintiff. *Id.* ¶ 22. Plaintiff offers no evidence rebutting the fact that Officer O'Donnell's presentation to Judge Ford took place. The warrant appears facially valid. With the sole exception of where "the officers responsible for effectuating the arrest knew that the warrant was issued without probable cause," which Plaintiff does not argue and the evidence does not bear out, "a person arrested pursuant to a facially valid arrest warrant cannot prevail on a section 1983 claim of false arrest." *Williamson*, 714 F.3d at 441–42.

Plaintiff remembers being thirty feet away from the heroin sale. He may have been. But resolving that dispute is not relevant to Plaintiff's claim of unlawful arrest. The law clearly establishes that a claim under the Fourth Amendment alleging issuance of a warrant without probable cause requires proof that the officer had no reasonable basis for seeking the arrest warrant. The factual record before the Court reveals that there is no genuine dispute of material fact as to the reasonable basis on which Officer O'Donnell believed he had cause to seek the arrest warrant. Summary judgment based on qualified immunity is therefore appropriate on the false arrest claim.

### B. The Court Declines to Exercise Jurisdiction Over the State Law Claims

Plaintiff also brings a claim against the City of Chicago for malicious prosecution under Illinois law. But the Court has granted Officer O'Donnell qualified immunity on Plaintiff's

---

[2] Plaintiff's citation to *Quinones v. City of Evanston*, 58 F.3d 275 (7th Cir. 1995), for the proposition that a discriminatory state law is not a defense to liability under federal law is confusing at best. *Quinones* involved allegations of discrimination under the Age Discrimination in Employment Act and involved a municipality's defense based on a state directive. *Id.* at 277. Even if Defendants were relying on the Illinois warrant statute as a legal defense (which they do not appear to be), Plaintiff does not argue that the Illinois statute is discriminatory and does not lodge a facial challenge to the statute.

Fourth Amendment claim. No federal claims remain. This Court may decline to exercise supplemental jurisdiction over a state-law claim that "substantially predominates over the claim or claims over which the district court has original jurisdiction." 28 U.S.C. § 1367(c)(2). "[I]f it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Plaintiff's malicious prosecution claim involves different facts, different state law actors, and concerns different substantive law. The remaining state law claim therefore substantially predominates over the federal claim for unlawful arrest. Consequently, the Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining state law claim.

## V. Conclusion

For the reasons stated herein the Court grants Defendants' motion for summary judgment [51]. Civil case terminated.

**SO ORDERED**     ENTER: 1/15/15

**JOHN Z. LEE**
**United States District Judge**